UNITED STATES of America, Appellee,

v.

Sam PUGLIESE and Anthony Izzo, Defendants-Appellants.

Nos. 663 and 662, Dockets 82–1250 and 82–1252.

United States Court of Appeals, Second Circuit.

Argued Jan. 4, 1983.

Decided July 7, 1983.

John H. Jacobs, New York City (Kulcsar & Jacobs, New York City, of counsel), for defendant-appellant Pugliese.

George R. Goltzer, New York City (Finger, Goldberg & Asen, P.C., New York City, of counsel), for defendant-appellant Izzo.

John N. Villios, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Jane Simkin Smith, Asst. U.S. Atty., Brooklyn, N.Y.; of counsel), for appellee.

Before KEARSE, WINTER and PRATT, Circuit Judges.

PRATT, Circuit Judge:

Sam Pugliese and Anthony Izzo appeal from judgments entered in the United States District Court for the Eastern District of New York (Eugene H. Nickerson, *Judge*), convicting them, upon a jury verdict, of conspiracy to import heroin into the United States, 21 U.S.C. § 963 (1976); importation of heroin into the United States, 21 U.S.C. §§ 952(a), 960(a)(1) (1976); and possession of heroin with the intent to distribute, 21 U.S.C. § 841(a)(1) (1976). Both defendants contend that expert testimony by an agent of the Drug Enforcement Administration (DEA) was improperly admitted into evidence. In addition, Pugliese argues that the evidence against him was insufficient to support the importation and possession counts, and Izzo asserts that Judge Nickerson erred in excluding from evidence a sworn statement by a witness who was unavailable at the time of trial.

Finding no merit in any of these contentions, we affirm.

## I. BACKGROUND

On July 10, 1981, customs officials at J.F.K. International Airport in New York apprehended Surinder Mehta when a routine inspection revealed that he was attempting to smuggle roughly four kilograms of heroin into the United States from his native India. Within an hour of his arrest, Mehta agreed to cooperate with the DEA by making recorded telephone calls and arranging a controlled delivery of the heroin to its intended recipients. Over the course of the next four days, Mehta completed a closely supervised deal with defendants Pugliese and Izzo which led to their arrest and subsequent convictions.

### A. *The Government's Case-In-Chief*

Mehta's testimony was the centerpiece of the government's proof at trial. He testified that he first met Pugliese and Izzo in March 1981, when he traveled to the United States on behalf of a fellow countryman, Sam Biryani. The dual purpose of his mission was to collect money owed Biryani from a previous heroin transaction, in New York, and to contact one Jeffrey Robinson, who had previous contacts with both Biryani and Mehta, in Florida. Biryani had allegedly instructed Mehta to ask Robinson whether he knew of any prospective purchasers of Biryani's heroin.

Mehta testified that shortly after he arrived at Robinson's house in Pompano Beach in March, Pugliese appeared on the scene. Upon being informed of Mehta's purpose, however, Pugliese immediately ruled out the possibility of any personal involvement. Nevertheless, he volunteered to put Mehta in touch with someone who might be interested and proceeded to drive him to Izzo's home. There, Pugliese introduced Mehta as "the one we have been waiting for" and Izzo echoed "we have been waiting for you for a long time". Mehta then indicated that "we can get heroin into this country" in approximately four to five

weeks, and Izzo, in turn, claimed that he could sell it. Mehta left this meeting with Pugliese's business card in hand and eventually returned to India via New York.

Mehta next returned to Florida in May 1981. He made arrangements to meet Pugliese at a bar where he informed him that a shipment could be sent in three to four weeks; Pugliese remained noncommittal. The two then drove directly to Izzo's house where Izzo confirmed his willingness to proceed with the transaction. Once again, Mehta returned to India via New York.

The prosecution presented the critical events of the four days immediately following Mehta's arrest to the jury by combining Mehta's testimony with tape recordings of the phone calls he placed to Pugliese and Izzo during that time. This evidence showed that on July 11, the day after he was arrested, Mehta spoke with Pugliese twice. In the first conversation, Mehta told Pugliese that he had arrived in New York with the "things". This prompted the following exchange:

Pugliese: Well I don't know with these guys here, I don't trust 'em.

Mehta: Who?

Pugliese: None of 'em. I only wonder if you want to deal with them direct. That's different. You know where Jeffrey is don't you?

Mehta: Um hum.

Pugliese: Well?

Mehta: Well, I don't know about ... I don't know. You are the only man whom I, whom I trust, you know.

Pugliese: Well, I I I don't want ... I can't. . . . I don't want to get involved with it, Doc, I don't want to have anything to do with it. 'Cause I I its too risky for me, and these men, these people are ... are that handle that stuff are nuts ... I don't know, I'm going down to see Tony right now. I ought to see him in about two hours. If you want me to give him a message I can give him a message.

Despite his apparent uneasiness, as the conversation continued Pugliese agreed to have Mehta telephone him later. Before hanging up, Pugliese also defined the limited role he was willing to play in the evolving negotiations:

Pugliese: Yeah. The only thing I say is this, doc.

Mehta: Right.

Pugliese: I mean if I, if I can arrange this for you.

Mehta: Right.

Pugliese: Just don't forget me.

Mehta: Ok.

Pugliese: I can't make nothing· on this end.

Mehta: Ok.

Pugliese: All right.

Mehta: Ok.

Pugliese: And I know you'll treat me right.

Mehta: Ok. And, uh, Sam.

Pugliese: Yeah.

Mehta: And, uh, make sure that I get my money.

Pugliese: Well, this is what I mean, I'm gonna you know put you together.

Pugliese: And I'll try I'll do everything I can. The only thing I'm saying to you—I'm not guaranteeing anything. . . .

Several hours later, however, Pugliese was willing to play a more active role. During the second of the recorded July 11 conversations, Pugliese and Mehta openly discussed the quality, quantity and price of the heroin, while Pugliese occasionally conferred with Izzo in inaudible side conversations. Pugliese further advised Mehta: "I'm going between for the two of you and if Tony guarantees it ... Tony says to me yeah the money is there ... then I'll go ahead and guarantee it too". However, because Pugliese was reluctant to meet Mehta at the airport if he was carrying "that stuff", the conversation ended with an agreement that Mehta would call Pugliese from a motel when he arrived in Florida two days later.

Mehta arrived in Miami as scheduled on July 13, accompanied by four or five DEA agents. That evening he spoke briefly with Izzo; the following morning he placed a call

to Pugliese and received return calls from both Izzo and Pugliese. From these recorded conversations, it was apparent that Izzo was prepared to exclude Pugliese from the transaction in order to maximize his own profit. Pugliese, on the other hand, reverted to his earlier position on the periphery of the dealings, but nevertheless claimed a personal stake. He thus indicated to Mehta that although Mehta would be dealing directly with Izzo, he should "remember" Pugliese since Pugliese had been "hurt pretty bad with Jeffrey". In the last recorded conversation, Pugliese informed Mehta that Izzo was on his way to Mehta's hotel and reminded Mehta: "Don't forget, you're taking me in now".

When Izzo arrived at Mehta's hotel with his girl friend that afternoon, he was greeted in the lobby by Mehta and DEA undercover agent Jerry Castillo, whom Mehta introduced as his "friend". All four proceeded to Mehta's room where Izzo was told he was to negotiate with Castillo. According to Castillo, Izzo originally indicated that he wished to take a small sample of heroin and have it tested. If satisfied, he would then purchase one-half to one kilogram at a time in separate purchases. After Castillo feigned anger that Izzo was not simply taking all four kilograms, the two agreed upon a price of $78,000 per kilogram. Izzo used a calculator to determine a price per ounce of $2,000, which he removed from a small purse and handed over to Castillo. Castillo then produced a package from which Izzo was to weigh out an ounce, but no scale was available. Izzo found a smaller bag within the package, containing what appeared to be approximately ten grams of heroin, and indicated that he would take that in lieu of an ounce. However, Castillo refused to refund Izzo's $2,000, stating, in his own words, "No, Tony, we already made a deal on the ounce." Instead, Castillo offered Izzo the opportunity to take a second ounce on credit, which Izzo accepted. Before Castillo gave the arrest signal, Izzo also indicated to Castillo, who pretended to be nervous about keeping the remainder of the heroin in the hotel room, that he knew of a "stash place" in Pompano.

To bolster its case on the conspiracy count, the government also called James Robert Hook as a witness. Testifying as a cooperating witness under an agreement with federal and state authorities, Hook claimed that he was present at a meeting at Izzo's house in late April or early May 1981, at which Pugliese instructed a man known as "R.G." to go to India to help arrange a heroin transaction. This testimony was corroborated by the introduction into evidence of a passport application executed by a "Richard David Goodman", a Pan American Airlines ticket issued to "R. Goodman" showing the holder's itinerary for April 29 to June 16, 1981, including a stay in New Delhi from May 22 to June 12, 1981, and a customs declaration executed by "Richard David Goodman" on June 16, 1981 upon his return to the United States.

## B. *The Defense Case*

In contrast to the government's theory that the July shipment marked the culmination of a conspiracy to import heroin into the United States which Pugliese and Izzo formed with Mehta in March and May of 1981, the defense attempted to establish that Mehta originally intended to deliver the four kilograms to his brother-in-law in New York, and that it was only after he was arrested that he targeted Pugliese and Izzo in order to shield his true co-conspirators. As a corollary, the defense attempted to demonstrate that "[a]ll of the negotiations and machinations were a stupid and misguided effort to procure a couple of thousand dollars worth of heroin for Izzo's use, not the importation conspiracy and substantive crimes charged." Appellant Izzo's Brief at 11.

To establish a foundation for these related theories, defense counsel first called two witnesses who testified as to Pugliese's character and a third who discredited Hook's testimony. Counsel then attempted to introduce sworn statements given on July 27, 1981 by Jeffrey Robinson and his wife, Delyse Robinson, asserting that the Robinsons were unavailable to testify and that their statements were admissible under

Fed.R.Evid. 804(b)(5), the so-called "residual exception" to the hearsay rule. In these statements, which were taken in the presence of Pugliese and Izzo and were elicited in response to questions posed by Pugliese's attorney, the Robinsons offered their version of the circumstances surrounding Mehta's visits to Florida in the spring of 1981.

According to Jeffrey Robinson's statement, Mehta arrived unexpectedly at his home in Pompano one evening in "approximately May 1981". With him were two Indian men, one of whom was his brother-in-law. As Mehta began to drink, he boasted that this duo had assisted him in the importation of heroin into New York. Shortly after these guests arrived, Pugliese and Izzo arrived, also unexpectedly, supposedly so that Pugliese, who was in the real estate business, could see Robinson's house. While Mehta, who by this time was quickly getting "loaded", continued to brag about his dope dealing, neither Pugliese nor Izzo indicated any interest. Rather, Robinson swore: "I was the one that was going to get rid of the dope for him if he brought in the right dope". When asked to elaborate, Robinson explained: "I told him I wanted to bring in thousands of pounds of hash[ish]. . . . [But] [h]e was talking about using heroin. I told him, 'I am a user. I can't get rid of it.' I said, 'I'll use it, but who am I going to sell it to?' "

Delyse Robinson's brief statement also tended to support defendants' position. She claimed that she last saw Mehta on or about July 1, 1981, while she was on a working vacation in India. At that time, Mehta allegedly introduced his "youngest brother-in-law" to her as a heroin courier and also revealed that his "other brother-in-law" was a New York heroin distributor.

When counsel for Pugliese proffered the Robinsons' statements as residual exceptions to the hearsay rule, the prosecution objected on multiple grounds, arguing that (1) it had not received proper notice of defendants' intent to offer the statements; (2) parts of the statements presented multiple hearsay problems; (3) it would have no opportunity to cross-examine the declar-

ants; and (4) the reliability of the statements was compromised because only Pugliese, his attorney and Izzo were present when they were given. Although defense counsel conceded, in response to the multiple hearsay problems noted by the government, that certain portions of the statements would be subject to redaction, Judge Nickerson excluded them entirely:

It seems to me that statements which I have read—you'll mark them for identification so you'll make a record—do not have equivalent circumstantial guarantees of trustworthiness covered by the other exceptions in Rule 804 that the general purposes of the rules of evidence in the interest of justice will not be best served by admission of the statements in evidence.

And furthermore, that the defendant did not make known sufficiently in advance of the trial to the government the intention to offer the statements and particulars of it including the names and addresses of the defendants [sic] so as to provide the government with a fair opportunity to prepare and to meet it.

The defense then called Pugliese as its final witness. In testimony which Judge Nickerson described at sentencing as "totally incredible" and "perjurious", Pugliese claimed that he had only tried to help Izzo, who had a severe drug problem and was desperate for heroin in July 1981, obtain a small quantity for his own use. Pugliese testified that he first met Mehta in May 1981—not March—when he and Izzo went to Jeffrey Robinson's home in connection with a real estate transaction. Although Mehta and Robinson discussed heroin in his presence, he only gave Mehta his card because Mehta had expressed some interest in purchasing real estate. Pugliese also maintained that his recorded statement to Mehta that he had been "hurt pretty bad with Jeffrey" referred to a $2,000 loan he made to Robinson and that he told Mehta "don't forget me" because he was hoping that Mehta might refund $100 or $200 to him if Izzo purchased some heroin, thereby cutting down on Izzo's cost. He also said that he

had hoped that Mehta would enter into a real estate deal which would enable him to earn a commission.

## C. *The Government's Case on Rebuttal*

After it became apparent that defendants were relying, at least in part, on a "personal use" defense, the prosecution called Special Agent William Simpson of the DEA as a rebuttal witness. Over objection, Simpson testified as to the quantity and quality of heroin typically purchased for personal use. Specifically, he stated that a typical heroin purchase by an addict would be a "quarter bag" of heroin consisting of about 2.6 or 2.7 grams of heroin and costing $25 or $30, which would ordinarily last from one to two days. Simpson further testified that the purity of heroin purchased in New York City might be 2 or 3 percent, whereas the purity in Hong Kong or Thailand might be 10 or 20 percent, but would never approach 60 percent. Simpson explained that imported heroin generally has a relatively high purity and is diluted a number of times to increase the importer's profit. Simpson also stated, based on his experience, that a heavy heroin user who needed heroin could not wait two days to obtain it, or negotiate a purchase for his own use on the third day, without some type of medication.

## II. DISCUSSION

### A. *The Admissibility of Jeffrey Robinson's Statement*

On appeal, neither defendant challenges the exclusion of Delyse Robinson's statement, and Izzo alone claims that Judge Nickerson abused his discretion in excluding Jeffrey Robinson's statement from evidence. But Izzo does not rely on the residual exception, Fed.R.Evid. 804(b)(5), as did counsel for Pugliese when the latter originally proffered both Robinsons' statements below. Rather, he argues that Jeffrey Robinson's statement was admissible under the "statement against interest" exception to the hearsay rule, Fed.R.Evid. 804(b)(3).

Whatever merit Izzo's argument might have, it has not been preserved for appel-

late review. When counsel for Pugliese first offered the Robinsons' statements, Judge Nickerson inquired as to how he proposed to overcome the hearsay objection that the government would inevitably raise. Counsel for Pugliese responded by invoking Rule 804(b)(5). Throughout the ensuing colloquy, counsel for Pugliese, the prosecutor and Judge Nickerson focused exclusively on whether the prerequisites set forth in Rule 804(b)(5) had been satisfied. Counsel for Izzo remained silent. Not surprisingly, when Judge Nickerson placed his decision on the record, he ruled only on the residual exception.

■ Having failed to argue below that Jeffrey Robinson's statement was admissible as a statement against interest, Izzo cannot raise this argument for the first time on appeal. Fed.R.Crim.P. 51; *United States v. Anderson,* 618 F.2d 487, 490–91 (8th Cir.1980); *United States v. Sims,* 617 F.2d 1371, 1377 (9th Cir.1980); *Huff v. White Motor Corp.,* 609 F.2d 286, 290 n. 2 (7th Cir.1979); *United States v. Lara-Hernandez,* 588 F.2d 272, 274 (9th Cir.1978); *see Petrocelli v. Gallison,* 679 F.2d 286, 291 (1st Cir.1982); *United States v. West,* 666 F.2d 16, 21 (2d Cir.1981); *see also Bowman v. Kaufman,* 387 F.2d 582, 588 (2d Cir.1967); *Shaw v. Scoville,* 369 F.2d 909, 912 (2d Cir.1966). *See generally* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 103 [03], at 103–31 to 103–32 (1982). Frequently, it can be argued in good faith that what appears to be inadmissible under one exception to the hearsay rule can be admitted into evidence either as non-hearsay or under another of the hearsay exceptions. Unless the basis for proposed admission is obvious, it is the burden of counsel who seeks admission to alert the court to the legal basis for his proffer. Contrary to Izzo's contention, the circumstances surrounding the offer of this unusual *ex parte* statement were not sufficient to alert Judge Nickerson to the possibility that portions of it might be admissible under the statement against interest exception.

■ Nor can we accept Izzo's argument that Judge Nickerson's ruling under Rule

804(b)(5) that the Robinsons' statements "do not have equivalent circumstantial guarantees of trustworthiness covered by the other exceptions in Rule 804" suggests that he considered the statement against interest argument to be before him. Rule 804(b)(5) provides that a statement "not specifically covered by any of the foregoing exceptions" may be admitted provided, among other things, it has "equivalent circumstantial guarantees of trustworthiness". By considering this factor, Judge Nickerson was simply applying the letter of the rule. He did not consider any of the more specific elements that must be present for a statement to qualify under the statement against interest exception and his passing reference to "other exceptions in Rule 804" cannot fairly be interpreted as a ruling on the applicability of Rule 804(b)(3).

Our determination that Izzo cannot now raise the statement against interest argument is not inconsistent with this court's decision in *United States v. Rosenstein,* 474 F.2d 705, 710–11 (2d Cir.1973). In *Rosenstein,* which preceded the Federal Rules of Evidence, the trial judge admitted certain exhibits under the business records exception to the hearsay rule, then codified at 28 U.S.C. § 1732. On appeal, this court held that that exception was inapplicable. Nevertheless, it reasoned that the proponent of the statements in question was not precluded from arguing on appeal that they were admissible under an alternative exception to the hearsay rule, provided that the purpose for which the evidence was introduced under the alternative theory would remain the same.

*Rosenstein* is clearly distinguishable from the case at bar. It is one thing for an appellate court to *affirm* a lower court's evidentiary ruling on a theory that was unnecessary for counsel to present below. It would be quite different for an appellate court to *reverse* a trial judge's evidentiary ruling on a ground that could have and should have been raised at trial.

### B. *Agent Simpson's Expert Testimony*

Both defendants argue that Judge Nickerson abused his discretion in allowing Agent Simpson to testify as an expert regarding typical characteristics of heroin addicts. They assert that this testimony was not sufficiently helpful to the jury to justify its admission under Fed.R.Evid. 702, and that even if technically admissible, the testimony should have been excluded under Fed.R.Evid. 403, because its prejudicial impact far outweighed any probative value. We reject both contentions.

Fed.R.Evid. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Whether a witness is "qualified as an expert" within the meaning of this rule is a preliminary question for the trial judge under Fed.R.Evid. 104(a), and his determination will not be disturbed unless "manifestly erroneous." *Fernandez v. Chios Shipping Co.,* 542 F.2d 145, 153 (2d Cir.1976) (quoting *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962)).

Defendants do not contend that Agent Simpson was not generally "qualified as an expert". Nor could they, since Simpson testified that he had been a DEA agent for approximately ten years, that he was a member of the New York Task Force making undercover narcotic purchases, conducting surveillance and making arrests in Harlem, and that he had purchased heroin hundreds of times. Before joining the Task Force he had worked for the DEA in Asia for four years. And he had previously directed a drug prevention and education program for the New York City Board of Education. Unquestionably, this background satisfied the "knowledge, skill, experience, training, or education" requirement of Rule 702. *See, e.g., United States v. Carson,* 702 F.2d 351 at 369 (2d Cir.1983).

What defendants do claim is that Agent Simpson's expertise did not extend to local conditions in the south Florida her-

oin market. Yet they offer no support for their view that those conditions differed markedly, or for that matter at all, from those in New York. While geographic considerations may, under certain circumstances, be relevant in determining whether a witness is "qualified as an expert" for purposes of Rule 702, *see Taylor v. Ouachita Parish School Board,* 648 F.2d 959, 970–71 (5th Cir.1981), this is simply not such a case.

It is equally clear that Agent Simpson's testimony could "assist the trier of fact" both to "understand the evidence" and "to determine a fact in issue". Courts have frequently permitted experts to testify regarding those aspects of narcotics transactions that are unlikely to be within the knowledge of the average layman. *E.g., United States v. Carson, supra* (clandestine manner in which drugs are bought and sold); *United States v. Johnson,* 575 F.2d 1347, 1360–61 (5th Cir.1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979) (source of marijuana); *United States v. Bermudez,* 526 F.2d 89, 97 (2d Cir.1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976) (visual identification of white substance as cocaine); *United States v. Clark,* 498 F.2d 535, 536–37 (2d Cir.1974) (street value of heroin); *United States v. Borrone-Iglar,* 468 F.2d 419, 421 (2d Cir. 1972), *cert. denied,* 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973) (coded conversations); *see also United States v. Martino,* 664 F.2d 860, 864 n. 3 (2d Cir.1981); *United States v. Cirillo,* 499 F.2d 872, 881 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); *cf. United States v. Maher,* 645 F.2d 780, 783–84 (9th Cir.1981).

■ In this case, the quantity and purity of heroin used by addicts is not the type of information that is commonly available to laymen. Yet without this information, the jury would have been hampered in its assessment of defendants' personal use defense. Agent Simpson's testimony that a typical user would purchase approximately 2½ grams of heroin with the purity of 2 or 3 percent for approximately $25 or $30 thus helped the jury to understand better the magnitude of a purchase of 1 ounce of heroin with the purity of 90 percent for $2,000, and thereby shed light on defendants' intent. Under these circumstances, Judge Nickerson correctly admitted the testimony under Rule 702.

■ Pugliese's argument that this testimony was unfairly prejudicial under Fed.R. Evid. 403 is also unavailing. The cases upon which he places principal reliance, *United States v. Green,* 548 F.2d 1261, 1268 (6th Cir.1977); *United States v. Hall,* 653 F.2d 1002, 1007 (5th Cir.1981), both involved expert testimony that went beyond the issues of fact that were properly before the jury. Yet that is not what happened here, since Agent Simpson's expert testimony was carefully tailored to facts which were very much at issue in this trial: whether the heroin was intended for Izzo's personal use and whether Pugliese's testimony concerning the events of July 10–14 was credible.

### C. The Sufficiency of the Evidence Against Pugliese

Pugliese also argues that the evidence was insufficient to prove that he participated in a conspiracy to import heroin or that he possessed heroin on or about July 10, 1981. Relying heavily on selected excerpts from the recorded conversations, Pugliese submits that the most the evidence showed with respect to the conspiracy count was that he agreed to help Izzo purchase some heroin for personal use *after* it was brought into the United States. As to the possession count, he claims that the evidence established only his "mere association" with the person who controlled the narcotics. *See United States v. Wilson,* 657 F.2d 755, 760 (5th Cir.1981).

■ Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we have little difficulty rejecting those contentions. Taken together, Mehta's testimony and his telephone conversations with Pugliese easily provide sufficient evidence to support Pugliese's conspiracy conviction. Mehta testi-

fied that he met with Pugliese and Izzo twice prior to his aborted attempt to smuggle the heroin into this country. As previously noted, at the first meeting, Pugliese introduced Mehta to Izzo as "the one we have been waiting for". Furthermore, Mehta's version of the events surrounding the formation of the conspiracy was corroborated by Hook.

Pugliese's role as a broker in the conspiracy is also evident throughout his taped conversations with Mehta. While Pugliese did at times express a desire to remain behind the scenes, the jury could rationally have concluded from the totality of the evidence that this was simply a means of minimizing his exposure. Indeed, DEA agent Castillo testified that the major figures in narcotics conspiracies were frequently several steps removed from the actual transactions.

■ The evidence also established that Pugliese was properly convicted for posses-sion of heroin on or about July 10, 1981, the date Mehta was arrested with 4 kilograms of heroin. As a member of the conspiracy to import heroin, Pugliese was equally guilty of the substantive offense of posses-sion committed by his co-conspirator in fur-therance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Stas-si,* 544 F.2d 579, 584 (2d Cir.1976), *cert. denied,* 430 U.S. 907, 97 S.Ct. 1176, 51 L.Ed.2d 582 (1977); *United States v. Bras-co,* 516 F.2d 816, 818 (2d Cir.), *cert. denied,* 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975).

Affirmed.