**UNITED STATES, Appellee,**

v.

**Corwin GAINES, Defendant, Appellant.**

**No. 97–2209.**

United States Court of Appeals,
First Circuit.

Heard Sept. 14, 1998.

Decided March 10, 1999.

---

Kimberly Homan with whom Sheketoff & Homan was on brief for appellant.

Michael D. Ricciuti, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Kimberly S. Budd and Dina Michael Chaitowitz, Assistant United States Attorneys, were on brief for appellee.

Before LIPEZ, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

LEVIN H. CAMPBELL, Senior Circuit Judge.

Corwin Gaines appeals from his conviction in the district court on two counts of possession of crack cocaine with intent to distribute and on one count of conspiracy to possess crack cocaine with intent to distribute. Gaines claims that the district court made several erroneous evidentiary rulings and improperly permitted the prosecutor to employ

a prohibited cross-examination technique. We affirm.

## I.

■ We recite facts the jury reasonably could have found, viewing the evidence in the light most favorable to the verdicts. *See, e.g., United States v. Josleyn*, 99 F.3d 1182, 1185 n. 1 (1st Cir.1996).

In the Spring of 1996, the U.S. Drug Enforcement Agency and Boston Police Department began a joint investigation into the distribution of crack cocaine from an apartment at 27 Lambert Avenue in the Roxbury section of Boston. The police had received several complaints that strangers were repeatedly arriving at the Lambert address, entering the apartment building, and then leaving two or three minutes later. Suspecting possible drug activity, the law enforcement officials began surveillance at 27 Lambert and employed a confidential informant ("the CI"), operating under the code name "Bugsy", to attempt to make controlled purchases of crack cocaine.

The surveillance revealed that Allen Franklin, a/k/a "Chico", was heading a crack cocaine distribution from two apartments in Roxbury, one at 27 Lambert Avenue and one at 34 Fisher Avenue. Franklin was assisted by several family members and friends, including his half-brother Dana Franklin, his grandmother, Geneva Franklin, and his cousin Larry "Little Bit" Eason. The Fisher address, where Allen Franklin resided, was used for preparing and bagging the crack cocaine into portions known as "dimes" (one-tenth of a gram) or "50 rocks" (one gram). The apartment at 27 Lambert Avenue, which was the home of Geneva Franklin, operated as the distribution network center.

Allen Franklin, Dana Franklin, and Dana Franklin's girlfriend, Amy Hatch, all testified for the prosecution. They asserted that Gaines was Allen Franklin's main supplier of crack cocaine. Allen Franklin testified that he would visit Gaines to purchase drugs approximately every three to four days, often buying them "on consignment" for later payment in cash. When Franklin wanted drugs, he stated that he would page Gaines. Gaines would then call him back and invite him to his apartment, which was located in a three-story apartment building at 78 Brookley Road in the Jamaica Plain section of Boston. Franklin would ring the doorbell at the entrance of the apartment building and wait to be let in. Either a key would be dropped to Franklin from the third-story outdoor porch or someone would let Franklin in. He would then get the crack cocaine from Gaines and return either to his own apartment at Fisher Avenue to prepare the drugs for sale, or directly to Geneva Franklin's apartment at Lambert Avenue, where a customer would be waiting. On the rare occasions when Gaines did not have any crack cocaine for him, Franklin said that he would go to an alternate supplier.

Allen Franklin's dealings with Gaines were corroborated by testimony of police officers who had conducted surveillance of the CI's purchases at the Lambert address. They observed the CI, wearing a hidden recording device, arrive at the Lambert address and request crack cocaine. Soon after, they saw Allen Franklin leave the apartment and drive to Gaines's apartment. Franklin was unaware that he was being followed by the police. The officers who conducted the surveillance confirmed that a key was dropped or Franklin was let in or otherwise accessed the building, and that after leaving the Brookley address, Franklin would return directly to Geneva Franklin's apartment or stop off at the Fisher address. On several occasions, Franklin made an additional stop at an undisclosed location, which the police surmised was the site of Franklin's alternate crack cocaine supplier.

According to Dana Franklin, who occasionally accompanied his half-brother to Gaines's apartment, Gaines would sometimes bring the crack cocaine directly to Allen Franklin's apartment at Fisher Avenue. Both Dana Franklin and Allen Franklin testified that the latter had fallen behind in his payments to Gaines, and Dana recalled once seeing Allen on his way to Gaines's apartment holding a shoe box and saying, "This will get us ahead." Dana took this to mean that the shoe box was full of cash and that they could finally repay their debt to Gaines.

On July 12, 1996, a federal search warrant was executed at Gaines's apartment. Massachusetts State Police Trooper Paul Hartley

lead a team of approximately six searching agents, who entered after both Gaines and his live-in girlfriend, Tara Ramos, had left the building. The agents found crack cocaine in several places in the apartment. The largest find was on the back outside porch. Inside a green trash bag, they found a ziplock bag containing 6.2 pounds of crack cocaine. In the dining room, the police discovered a black duffel bag with empty ziplock bags of a type similar to those found to contain crack cocaine on the porch. Also in the dining room was a black backpack containing a digital scale that measured weights as little as one-hundredth of a gram, and a Nike shoe box containing $587 in small denomination bills. On the highest shelf of the kitchen pantry, the officers found eight grams of crack cocaine in three separate bags. In a portable closet in the dining room, they found a Nike shoe box containing $7,000 cash in one-hundred dollar bills.

As the search was coming to a close, Gaines and Ramos arrived outside the apartment building. They were immediately detained and Gaines was informed that there was a federal warrant for his arrest. He was ultimately charged in an eight-count indictment naming him, Allen Franklin, and a man who had been living with Franklin at the Fisher address, Frank Turner. Franklin pled guilty to all counts and testified as one of the prosecution's chief witnesses against Gaines. After his first trial ended in a mistrial, Gaines was re-tried and convicted on three counts—two counts of possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and one count of conspiring with Franklin and Turner to possess cocaine base with intent to distribute, in violation of 21 U.S.C. § 846. This appeal followed.

## II.

### A. Allen Franklin's Testimony Regarding Geneva Franklin's Tape-recorded Statements

▮ Gaines assigns error to testimony that concerned the CI's controlled purchase of crack cocaine from Allen Franklin on May 21, 1996. On that day, the CI arrived at 21 Lambert Avenue and spoke with Geneva Franklin until Allen Franklin arrived with crack cocaine. The conversation was tape recorded by the CI. The transcript of that tape recording, which the parties stipulated could be used as an exhibit to clarify the tape recording itself, reads in pertinent part:

G. Franklin: Who is it?

CI: Bugs, Mama.

G. Franklin: Hey, Bugs.

CI: Hey, girl.

G. Franklin: Nobody's here, but they told me what to tell you when you come.

CI: Okay.

G. Franklin: I gotta go, uh, call the house.

. . .

CI: How you doing?

G. Franklin: I called the house.

CI: Uh huh.

G. Franklin: And uh Lisa said Chico and Frankie and Dawn had gone to meet the guy to get the stuff. .

. . .

G. Franklin: I don't know what's happening Bugs. Half the customers stopped coming here. I don't know why cause—

CI: Maybe the quality of, the quality of the stuff he's been havin' lately ain't all, ain't, ain't up to, to par, not what Chico usually has.

G. Franklin: Ain't what he usually has.

CI: No.

G. Franklin: 'Cause he usually has the best.

CI: Yep.

G. Franklin: But now, uh, uh, uh, he can't get the best stuff 'cause he ain't got that money the man want (unintelligible) get something else fast to get that man with the good stuff the money, you know.

CI: Uh huh. That's right.

. . .

G. Franklin: Yeah. The man called, Mr. Corwin Gaines, the other day. We'll definitely get you stuff, 'cause this might be good.

CI: Wow.

G. Franklin: (unintelligible) But the man don't get nothing but the good stuff.

After this excerpt was played for the jury, the prosecutor had the following exchange with Allen Franklin:

Q: Did you recognize the voices on the excerpted tape?

A: Yes, I do.

Q: Who is speaking?

A: My mother, Geneva Franklin, and Bugsy.

Q: When Geneva Franklin mentions Mr. Corwin Gaines, what is she referring to?

Defense: Objection.

The Court: Overruled.

A: She's referring to me going to his house to go pick up the crack.

Q: And what is she referring to when she says the man wants the money?

A: She was — what she was referring to by that was I already owed him some money so I had to go over there and pay him that money.

Q: And who was that?

A: Corwin.

Gaines contends that the district court committed reversible error in permitting Allen Franklin to express his opinion on what Geneva Franklin was referring to when mentioning Mr. Corwin Gaines and saying "the man wants money." Being a lay witness, not an expert, Allen Franklin could give his opinion only if it was rationally based on his perception and was helpful either to an understanding of his testimony or the determination of a fact in issue. Fed.R.Evid. 701; *United States v. Saccoccia,* 58 F.3d 754, 780 (1st Cir.1995), *cert. denied,* 517 U.S. 1105, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996).[1] A strong case can be made that Allen Franklin's challenged testimony *was* rationally based on his perception: he recognized his grandmother Geneva's taped voice; she stated in the tape that he ("Chico") had gone with Frankie and Dawn "to meet the guy to

get the stuff." From this and other parts of his own and the taped testimony, it was clear he was taking part at the time of the taped conversation in the events Geneva was describing. Extensive other evidence further indicated that Geneva and Allen Franklin were co-conspirators who worked closely together. The judge could conclude, therefore, that Allen was uniquely able, on the basis of his first-hand perception, to explain the particular references that day by Geneva, both of which, in fact, related to him. *See, e.g., United States v. Garcia,* 994 F.2d 1499, 1505–06 (10th Cir.1993); *United States v. Simas,* 937 F.2d 459, 464–65 (9th Cir.1991). Federal courts have often allowed lay witnesses with similar inside knowledge to give their opinions as to the meanings of "code words" used by fellow conspirators in taped conversations. *See, e.g., United States v. Elder,* 90 F.3d 1110, 1134 (6th Cir.1996), *cert. denied,* 519 U.S. 1131, 117 S.Ct. 993, 136 L.Ed.2d 873 (1997); *United States v. Flores,* 63 F.3d 1342, 1359 (5th Cir.1995); *United States v. Saulter,* 60 F.3d 270, 276 (7th Cir. 1995); *United States v. DePeri,* 778 F.2d 963, 977 (3d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986).

Gaines seeks to distinguish the "code word" case law by arguing that, in asking Allen Franklin what Geneva was "referring to" when she mentioned Corwin Gaines and said "the man wants money," the prosecutor went beyond seeking the witness's explanation of a co-conspirator's use of certain words. We are not so sure. *See Garcia,* 994 F.2d at 1505–06; *Simas,* 937 F.2d at 464–65. As noted, Allen Franklin was intimately familiar with, and had himself taken part in, the relevant events. He had also associated closely with his grandmother in the conspiracy as well as in the matters she was discussing. While we do not say the court was required to have allowed the prosecutor's question in the form put, it is hard to say the district court committed a "manifest abuse of discretion" in allowing the question, given the evidence of Allen Franklin's first-hand familiarity with the surrounding events and con-

---

1. Federal Rule of Evidence 701 provides:
   If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or infer-

   ences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

duct. *See Alexis v. McDonald's Restaurants of Massachusetts, Inc.*, 67 F.3d 341, 347 (1st Cir.1995) (admissibility of lay opinion testimony subject to review for manifest abuse of discretion).

Even, moreover, if the court were found to have abused its discretion in allowing the question, there would be no reason to reverse. It is doubtful, to begin with, whether Gaines's unexplained objection preserved the issue he now argues. *See* Fed.R.Evid. 103(a)(1). Clearly, it is not obvious how and whether Federal Rule of Evidence 701 should be applied in this context. It is hard to say, therefore, that the specific ground for objection was "apparent from the context," obviating any need to state the specific ground for objection. If so, our review is solely for "plain error," and Gaines clearly loses out.

██ But beyond that—even if we were to rule that lodging an unexplained objection sufficed to preserve the point and that the district court had erred in admitting the testimony—the error would be harmless. *See* Fed.R.Crim.P. 52(a). Harmless error analysis focuses on whether the error "had substantial and injurious effect or influence in determining the jury's verdict," *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *compare Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *Harry T. Edwards, To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated,* 70 N.Y.U. L.Rev. 1167 (1995).

In contending that the jury's verdict was seriously affected, Gaines makes much of the fact that the prosecutor stated during closing argument that "If [Gaines was] not involved in any way, why would his name be mentioned? Why would Allen Franklin's grandmother name him as the supplier?" According to Gaines, this statement demonstrates the importance placed on the improperly admitted testimony, both by the prosecutor and, by inference, the jury. However, even

without Allen Franklin's explanation, Geneva Franklin's statements on their face implied that Gaines was the supplier and that Allen owed him money. She explicitly explained "Chico's" (Allen Franklin's) inability to get the best "stuff" as resulting from a lack of "that money the man want." She then said, "[t]he man called, Mr. Corwin Gaines, the other day." Being "the man," Gaines would be the supplier. Hence, even without Allen Franklin's gloss, the prosecutor could permissibly have argued directly from her statements, and the jury could have believed, that Geneva had named Gaines as the supplier.[2] Moreover, the prosecutor emphasized to the jury that Geneva Franklin's words were but one piece of the puzzle to be considered along with, *inter alia*, the tape-recorded statements of co-conspirators Frank Turner and Larry Eason (who also made mention of Gaines); the testimony of Allen Franklin, Dana Franklin, and Amy Hatch (each of whom named Gaines as the supplier); the testimony of the surveillance officers concerning Allen Franklin's visits to Gaines; and the stash of drugs uncovered in Gaines's apartment.

In the circumstances, Allen Franklin's permitted explanation of Geneva Franklin's references in her taped remarks was hardly of great moment. Given Allen Franklin's strongly corroborated testimony of his visits to Gaines to procure crack cocaine and of the fact that he was indebted to Gaines, his opinion that Geneva was referring to Gaines and to Allen's indebtedness to Gaines added little overall to the weight of the evidence before the jury.

### B. Tara Ramos's Out-of-court Declaration

Gaines claims error in the district court's refusal to allow Officer David O'Sullivan to testify that Ramos said "Fucking Franklin" when she saw Trooper Hartley remove a green garbage bag containing crack cocaine during the police search of Gaines's apartment. He argues on appeal that Ramos's

---

2. Moreover, much the same concept could have been (as it was) conveyed to the jury, without any issue of technical error, had the prosecutor simply caused Franklin, after identifying his grandmother's voice on the tape, to reiterate that he was known as "Chico," that he had indeed gone that day with Frankie and Dawn to get crack cocaine from Gaines, that Gaines was, as Franklin had already testified, the supplier, and that, again as testified, Franklin owed him money.

utterance would have corroborated Gaines's defense that the drugs belonged to Allen Franklin, who had been allowed to store things in Gaines's apartment including—ostensibly unknown to Gaines—drugs. Gaines also points out that the prosecution made much of O'Sullivan's testimony that Ramos became distraught, as did Gaines, when each became aware that the green bag was being removed. According to the prosecution, Ramos's and Gaines's reactions demonstrated consciousness of guilt. Ramos's "Fucking Franklin" comment might—according to Gaines—have indicated some reason, other than personal guilt, for Ramos, and Gaines himself, to have become upset.

The colloquy at trial relative to the "Fucking Franklin" remark was laconic, to say the least. During cross-examination of Officer O'Sullivan, defense counsel asked, "Did you hear Tara [Ramos] say anything about Allen Franklin in an uncomplimentary way?" The prosecutor objected and the court said, "Sustained." A side bar conference followed at which defense counsel told the judge that Tara said, "Fucking Franklin." The prosecutor stated, "It's hearsay"; the court replied, "Yes"; defense attorney proposed, "State of mind"; and the court responded, "No. Objection sustained." That ended the matter. Appellant now claims that exclusion of the comment was reversible error.

On appeal, Gaines no longer cites the state of mind exception to the hearsay rule, *see* Fed.R.Evid. 803(3), as a ground for admitting the "Fucking Franklin" remark. Rather Gaines says the statement was either not hearsay at all, being non-assertive, or else should have come in under the excited utterance exception to the hearsay rule. *See* Fed. R.Evid. 803(2).

■ A basic problem with Gaines's appellate arguments for admission is that neither ground was presented to the trial court. Grounds not identified at trial on which rejected evidence is admissible will ordinarily not provide a basis for reversal on appeal. *See* Jack Weinstein, Weinstein's Federal Evidence § 103.20[5], at 103–37 & n. 10 (2d ed.1997). As Judge Pratt, writing for a panel of the Second Circuit, stated some years ago,

Frequently, it can be argued in good faith that what appears to be inadmissible under one exception to the hearsay rule can be admitted into evidence either as non-hearsay or under another of the hearsay exceptions. Unless the basis for proposed admission is obvious it is the burden of counsel who seeks admission to alert the court to the legal basis for his proffer.

*United States v. Pugliese,* 712 F.2d 1574, 1580 (2d Cir.1983); *see also, e.g., United States v. Powell,* 894 F.2d 895, 901 n. 5 (7th Cir.1990).

[7, 8] Absent mention below, therefore, of the bases currently advanced for admission, exclusion of the proffered "Fucking Franklin" statement can be successfully raised on appeal only if the district court's ruling amounted to plain error. *Powell,* 894 F.2d at 901 n. 5. That standard is plainly not met here.

■ We shall assume, without deciding, that there is merit to one or even both of the grounds for admission now put forward. In particular, the "excited utterance" exception, had it been presented to the trial judge, seems a persuasive basis for admission. Nonetheless, omission of the statement fell well short of causing a "miscarriage of justice," an essential element of plain error. *See United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). We note that Gaines himself gave a different explanation of why he became distraught and never mentioned Ramos's utterance (nor did Ramos herself ever attempt to mention her alleged utterance when she testified.) Gaines testified the cause of his change in demeanor was that one of the police officers told him that they had found crack cocaine on his back porch and he was going to jail for a long time. While Ramos's "Fucking Franklin" comment might still have bolstered the defense's attribution of the drugs to Franklin, it might equally have led the jury to think that Ramos knew more about the bag's contents than she had acknowledged. Officer O'Sullivan testified that the contents of the bag could not be seen. For Ramos to

react so strongly might suggest she knew all along they contained drugs. The comment was also perfectly consistent with her believing that Franklin was the informer who had turned them in to the police, not merely the sole culprit himself. We further note that another witness, Lino Grau, apparently mentioned Tara's comment to the jury, although her testimony may have been blunted by a ruling of inadmissibility. In any event, given the strength of the government's evidence, and Gaines's and Tara's opportunity to otherwise explain their defense, there was no miscarriage of justice in the exclusion of Officer O'Sullivan's testimony concerning Ramos's remark.

### C. Testimony by IRS Special Agent Youngquist

Gaines assigns error to certain opinion testimony by Special Agent Lauren Youngquist of the Criminal Investigation Division of the IRS. The government called Special Agent Youngquist to testify regarding her investigation of Gaines's finances in 1996. While she testified that she had been a special agent for over nine years and had participated in 75 narcotics cases for the IRS, she was never tendered as an expert witness, and the court never expressly qualified her as such. Agent Youngquist described her duties as assisting investigations, interviewing witnesses, and looking at evidence. In this case, she testified to comparisons between Gaines's income tax records and the funds he expended. Her investigation revealed that Gaines's rent at the Brookley address was $800 per month, which he always paid in cash, excepting one payment via a money order. She discovered that Gaines paid $175 cash for the apartment's alarm system and approximately $8,000 cash for the audio/video system found in the apartment, and that approximately $7,500 in cash was found in the apartment.

Agent Youngquist then testified that she considered Gaines's use of cash significant because it was "consistent with drug dealing" and "very difficult to trace." While defense counsel objected to this testimony, he offered no specific grounds for the objection.

Gaines argues on appeal that it was prejudicial to allow Agent Youngquist's testimony that using cash is "consistent with drug dealing," both because the testimony lacked "helpfulness to the jury" and because of "the grave danger of prejudice inherent in such testimony." Gaines also states in his brief that Agent Youngquist lacked the experience to render such an opinion, but declares he does not now pursue that point because he made no objection at trial concerning her lack of qualifications.

We have discussed the use of expert testimony regarding the operation of criminal schemes and activities in *United States v. Montas*, 41 F.3d 775, 781–84 (1st Cir.1994). As we said there, such testimony can be "helpful to juries in understanding some obscure or complex aspect of the crime." *Id.* at 783. Expert testimony is not admissible, however, on "matters that [are] readily intelligible" and may, in some cases, create unfair prejudice by appearing to put the expert's stamp of approval on the government's case. *Id.* at 784.

We think that whether or not, in general, cash is used in, and is consistent with, drug-dealing is a dubious subject, at least in an ordinary case, for expert opinion testimony. As the Second Circuit has stated, it "has a common sense aspect to it that makes its admission more troubling." *United States v. Tapia–Ortiz*, 23 F.3d 738, 741 (2d Cir.1994). It is hard to see here why the jury needed Agent Youngquist's generalization given her detailed testimony regarding Gaines's tax records and his various cash purchases, all of which clearly highlighted the issue of the sources of his cash and whether or not drug dealing was the likely explanation. *Compare id.* at 741–42 (expert testimony upheld identifying beepers, cash, and nicknames as drug trafficking techniques when introduced to rebut defense claims that defendants' activities did not suggest criminal conduct).

Had the defense objected on the express ground that this testimony was not a proper subject of expert testimony under Federal Rule of Evidence 702 or was unfairly prejudicial under Federal Rule of Evidence 403, it might well have been error for the court to have allowed Agent Youngquist to

respond as she did. But as occurred in *Montas,* defendant objected but stated no grounds. We accordingly review for plain error only. *Id.* For much the same reasons stated in *Montas,* any error that occurred fell short of being "plain." *See id.* Indeed, the questions asked and answered seem less potentially prejudicial than those in *Montas.* The claimed interrelationship between the drug transactions ascribed to Gaines and his use of significant cash sums were issues already fully on the table. That cash might be used because it is difficult to trace, and that cash was "consistent with" drug dealing, could hardly have been very novel or startling ideas to this jury.

### D. The Prosecutor's Cross-examination of Gaines

■ Gaines contends that the prosecutor erroneously asked him during cross-examination to comment on the credibility of other witnesses, and compounded the error by highlighting this exchange during his closing argument to the jury.

Towards the close of his cross-examination, the prosecutor asked Gaines nine times to comment on the testimony of other witnesses or evidence previously introduced:

Q: And when Dana Franklin got on the stand and identified you as the crack dealer, he was wrong, right?

A: Yes, he was.

Q: And when all those people on the tapes identified you as the crack dealer, they were wrong, right?

A: I never heard anyone identify me as the crack dealer.

Q: Did you hear Geneva Franklin say, Mr. Corwin Gaines has got the stuff? Remember that tape?

A: I heard her say, he's got the stuff.

Q: And she's wrong, right?

A: I never heard her say what stuff.

Q: If there's a voice on that tape, Mr. Gaines, that identifies you as a crack dealer, that voice would be wrong?

A: Yes, it would be.

Q: And Allen Franklin when he got on the stand—

A: Would be lying.

Q: He would be wrong, too?

A: Yes.

Q: And Amy Hatch, she's wrong, too?

A: Yes, she is.

Q: And even Brian Halliday when he said these were the books—

A: He never said these were books.

Q: He was wrong if he did, though, right? He was wrong if that's what he said to this jury?

A: He didn't say that.

Q: Well, let's set that aside, Mr. Gaines. And your own mother when she testified that video projector, she's wrong, too, right?

A: If those are your words.

Q: Weren't they hers?

A: Similar to it, yes, they were.

Q: And if she says it looked just like that, she would be wrong, too, right?

A: She didn't say that.

The prosecutor alluded to this exchange during his closing argument, stating: "And you decide if everyone else in this case is either wrong or lying, even Brian Halliday about the car books, even his own mother about the video equipment. Everyone is wrong in this case, according to Mr. Gaines, except him."

This circuit has held that it is improper for an attorney to ask a witness whether another witness lied on the stand. *United States v. Fernandez,* 145 F.3d 59, 64 (1st Cir.1998); *United States v. Sullivan,* 85 F.3d 743, 750 (1st Cir.1996); *United States v. Akitoye,* 923 F.2d 221, 224 (1st Cir.1991); *cf. United States v. Boyd,* 54 F.3d 868, 871 (D.C.Cir. 1995); *United States v. Richter,* 826 F.2d 206 (2d Cir.1987). Underlying this rule is the concept that credibility judgments are for the jury, not witnesses, to make. *Sullivan,* 85 F.3d at 750.

The prosecutor here did not, however, ask the witness whether he believed the others had lied. Instead, he asked whether the other witnesses or voices on tape recordings

were "wrong," rather than "lying." The witness was not required to choose between conceding the point or branding another witness as a liar. *See United States v. Gaind,* 31 F.3d 73, 77 (2d Cir.1994) ("Asking a witness whether a previous witness who gave conflicting testimony is 'mistaken' highlights the objective conflict without requiring the witness to condemn the prior witness as a purveyor of deliberate falsehood, i.e., a 'liar.' "). When Gaines finished the prosecutor's statement by saying that Allen Franklin "[w]ould be lying," the prosecutor's follow-up question clarified, "He would be wrong, too?" Hence the "L" word was avoided. Whether this avoidance would suffice in all situations, we need not decide now. As Gaines did not object in the district court to these questions or to the prosecutor's closing argument, our review is limited to plain error. Clearly that standard was not transgressed. The prosecutor's technique was, moreover, duplicated by Gaines's own counsel.[3]

### E. Allen Franklin's Testimony About Gaines's Defense Counsel

■ Gaines asserts that the district court committed reversible error in permitting Allen Franklin to testify that Franklin had been represented in defending against a 1995 drug charge by Michael Cioffi, one of Gaines's lawyers in the present case, and that Gaines was the person who had referred Cioffi to Franklin. According to Gaines, this testimony was unduly prejudicial in that it gave the jury an impression that Gaines had associated himself with a "drug lawyer."

In our view, Gaines's defense—that he barely knew Franklin and was unaware of Franklin's involvement with drugs—made Gaines's referral of an attorney to Franklin to defend him against a drug-related charge highly relevant. The government had a right to present evidence that such a referral had been made. However, the actual identity of the lawyer referred by Gaines was irrelevant

for this purpose. Testimony that the attorney in question was Mr. Cioffi, Gaines's trial counsel, needlessly injected Gaines's lawyer into the factual fabric of the case and created the troubling possibility that Gaines's choice of a trial attorney could be used by the jury to draw a negative inference about Gaines's involvement with drugs. Thus viewed, Franklin's testimony that Gaines referred him to Mr. Cioffi has arguable Sixth Amendment right-to-counsel implications.

■ Whether admission of the evidence was not only inappropriate but error is another matter, however. The presentation of this issue at sidebar was not as clear as it should have been. Defense counsel never urged that, if the court found the testimony generally relevant, it at least should exclude the attorney's name. We need not resolve whether the point was adequately preserved, however, because, in the context of the entire case, any error was harmless. The standard for determining harmless error is "whether we can say with fair assurance ... that the judgment was not substantially swayed by the error." *Vincent v. Louis Marx & Co., Inc.,* 874 F.2d 36, 41 (1st Cir.1989). There was compelling evidence establishing Gaines as Franklin's supplier of drugs. Moreover, we note that the evidence about Franklin and Mr. Cioffi did not implicate Gaines directly in the criminal activity charged. *See United States v. Figueroa,* 976 F.2d 1446, 1455 (1st Cir.1992). Given that the government did not refer to this evidence in its argument to the jury, and in light of the strong evidence against Gaines, we are convinced that the error was harmless because it is " 'highly probable' that the error did not contribute to the verdict." *United States v. Arias–Montoya,* 967 F.2d 708, 714 (1st Cir.1992).

### F. The District Court's Refusal to Allow a Surrebuttal Witness

■ We likewise accord little weight to Gaines's argument that the court below erred

---

**3.** Gaines's counsel used similar questions when cross-examining Dana Franklin:

> Q: Did your brother ever get the BMW out [of the repair shop] before he got arrested?
> A: No.
> Q: So if several agents saw him driving a BMW, they were wrong?

The district court sustained the government's objection to this question. Then, in cross-examining Allen Franklin, Gaines's counsel asked:

> Q: And your brother certainly is not lying for you?
> A: No, he's not.
> Q: And his girlfriend's not lying for him who's lying for you?

in refusing to allow him to call a surrebuttal witness, Tina Graham. In his case-in-chief, Gaines called James Harris, who testified that Gaines had been with him on a tour of comedy clubs on certain dates, including several of those named in the indictment. Ostensibly to assist his testimony, Harris referred to his 1996 datebook, which contained notations in red ink confirming his testimony about the dates Gaines was out of town with him. In rebuttal, the prosecution called U.S. Secret Service Senior Document Examiner Larry Stewart, who testified that scientific analysis revealed that particular kind of red ink appeared nowhere else in Harris's datebook. The unstated inference, of course, was that Harris had added the notations in a fraudulent attempt to lend credence to his testimony. The court then refused to permit Gaines to call a surrebuttal witness, Tina Graham, to testify that she was with Gaines at a comedy club in New Jersey on June 13, 1996, one of the dates in question.

A trial court has great discretion over the permissible scope of testimony in surrebuttal, *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 193 F.2d 162, 166–67 (1st Cir.1951), and that discretion was plainly not abused here. Ordinarily, surrebuttal should be allowed "only to explain away new facts brought forward by the proponent in rebuttal, or evidence to impeach witnesses who testified in rebuttal[.]" *Id.* Here, Tina Graham's testimony would have done neither. First, the issue of Gaines's whereabouts on June 13, 1996 was raised prior to the prosecution's rebuttal, by Gaines in his own case-in-chief. Thus, Gaines had the opportunity to call Graham at that time but elected not to do so. Second, Graham's testimony would not have impeached Senior Document Examiner Larry Stewart, as her testimony did not concern him or his ink analysis. The district court did not exceed its discretion in declining to allow her to be called as a surrebuttal witness.

## III.

Gaines argues that the cumulative effect of the errors he alleges should lead to reversal even if, looked at individually, each particular error is found insufficient. Our review of the record indicates that Gaines received a full and fair opportunity to present his defenses. Neither separately nor cumulatively do we find a basis to reverse in the alleged errors. We add that counsel has argued on appeal with notable competence.

*Affirmed.*