<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 99-1021

                         UNITED STATES,
                           Appellee,

                               v.

                      HECTOR LEON-DELFIS,
                     Defendant, Appellant.

                      ____________________

No. 99-1299

                         UNITED STATES,
                           Appellee,

                               v.

                    ELADIO SANTIAGO-SANCHEZ,
                     Defendant, Appellant.

                      ____________________

         APPEALS FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Juan M. Prez-Gimnez, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                 Wallace, Senior Circuit Judge,

                   and Lynch, Circuit Judge.

                     _____________________

   Eric M. Quetglas-Jordn, by appointment of the Court, for
appellant Hctor Len-Delfis.
   Joaqun Monserrate-Matienzo, with whom Joaqun Monserrate-
Peagarcano, was on brief, for appellant Eladio Santiago-Snchez.
   Aixa Maldonado-Quiones and Michelle Morales, Assistant United
States Attorneys, with whom Guillermo Gil, United States Attorney,
and Jorge E. Vega-Pacheco, Chief, Criminal Division, were on brief,
for appellee.

                      ____________________

                       February 16, 2000
                      ____________________

        WALLACE, Senior Circuit Judge.  Hctor Len-Delfis and
Eladio Santiago-Snchez were tried together for their participation
in a conspiracy to embezzle money while they were employees of the
United States Department of Veterans Affairs in Puerto Rico.  Len-
Delfis was convicted of one count of conspiracy to embezzle monies
of the United States in violation of 18 U.S.C.  371, 641, 654.  
Santiago-Snchez was convicted of (1) conspiracy to embezzle monies
of the United States; (2) embezzlement of public money;
(3) embezzlement of money by an employee of the United States; and
(4) money laundering, in violation of 18 U.S.C.  371, 641, 654,
1957.  The district court had jurisdiction pursuant to 18 U.S.C.
3231, and we have jurisdiction over these timely appeals pursuant
to 28 U.S.C.  1291.  We reverse Len-Delfis' conviction, but
affirm Santiago-Snchez's conviction.
                               I.
        The Department of Veterans Affairs (Department)
reimburses veterans for certain medical expenses.  To be
reimbursed, a veteran submits a claim with the help of a Department
benefits counselor.  A claim examiner inspects the claim to
determine accuracy and eligibility, then reviews the claim with a
senior claim examiner.  After the senior claim examiner approves
the claim, the veteran is paid.  The entire process normally takes
48 days to complete.
        The government alleged in its indictment that Department
employees in Puerto Rico encouraged veterans to submit inflated
medical expense claims fraudulently which they processed more
quickly than normal in return for a fifty-percent kickback.  It
stated that the government lost more than $1.3 million through this
embezzlement.  The government indicted six people for their
involvement, including Len-Delfis, a benefits counselor, and
Santiago-Snchez, a claim examiner.
        On appeal, Len-Delfis argues that the district court
erred in (1) not suppressing evidence of a confession he gave to
Federal Bureau of Investigation (FBI) agents following a polygraph
test and (2) not giving the jury a multiple conspiracy instruction.  
Len-Delfis, who filed his appellate brief first, attempted to
adopt by reference those arguments that Santiago-Snchez would
raise later in his brief.  Even assuming he can do so, Santiago-
Snchez raised no new issues that apply to Len-Delfis.
        Santiago-Snchez, in his brief, attempted to adopt by
reference Len-Delfis' argument regarding the jury instruction.  
See Fed. R. App. P. 28(i).  Additionally, he argues the district
court (1) made several evidentiary errors against him and
(2) should not have sentenced him to pay restitution.
                              II.
        Len-Delfis contends that the district court should have
granted his motion to suppress evidence of a confession he gave to
FBI agents after he took a polygraph test because he did not waive
his Sixth Amendment right to counsel for purposes of the post-
polygraph questioning.  In reviewing the denial of a motion to
suppress, we review the district court's findings of fact for clear
error and its conclusions of law and rulings on the
constitutionality of the government's conduct de novo.  See United
States v. Beras, 183 F.3d 22, 25 (1st Cir. 1999).
                               A.
        Len-Delfis testified to the following events at the
hearing on the motion to suppress.  Shortly before trial began in
June 1998, he and his attorney attempted to hold a meeting with the
Assistant United States Attorney prosecuting the case.  The meeting
was denied; however, Len-Delfis was asked, and agreed, to submit
to a polygraph test.  He reported to FBI special agents for the
test, but the appointment was rescheduled because he was not
accompanied by counsel.  On June 15, Len-Delfis and his attorney
arrived for the test.  Special Agent Lpez asked Len-Delfis to
sign two waiver of rights forms in Spanish:  a general Miranda
waiver, and a specific waiver for polygraph questioning.  A
translation of the first form reads as follows:
        INTERROGATORY; NOTIFICATION OF THE RIGHTS;
        YOUR RIGHTS

          Before I make [sic] any questions you should
        understand what your rights are.

          You have the right to keep silent.

          Whatever you say can be used in the court
        against you.

          You have the right to consult a lawyer so
        that he can instruct you before we make [sic]
        the questions and also you have the right that
        the lawyer be present during the
        interrogatory.

          If you cannot pay for the expenses of a
        lawyer, one will be assigned to you before we
        begin the interrogatory, if you so wish.

          If you decide to answer the questions now
        without the presence of a lawyer, still you
        have the right to deny to answer in any
        moment.  You also have the right to interrupt
        at any moment until you have consulted a
        lawyer.

        RESIGNATION OF THE RIGHTS

          I have read this statement of my rights and
        I understand what they are.  I am willing to
        make a statement and answer the questions.  I
        do not want a lawyer to be present at this
        moment.  I am conscious of what I do.  They
        have not made promises to me and I have not
        been threatened, and they have not put any
        pressure on me.

A translation of the second form reads as follows:
          CONSENT FOR INTERROGATORIES WITH THE USE OF
        POLYGRAPH

          Before we make [sic] any question with the
        use of polygraph (liar [sic] detector) with
        respect to receipt of money from Veterans
        Administration clients you should have knowing
        [sic] of your rights

          YOUR RIGHTS

          You have the rights [sic] to deny to take an
        examination with the polygraph.

          If you decide to take the examination with
        the polygraph, you have the right to deny to
        answer any question.

          RESIGNATION OF RIGHTS AND CONSENT

          I have read this statement about my rights
        and I understand my rights.  I am willing of
        my own voluntary [sic] to be questioned using
        the polygraph during my interview.  I
        understand and I know what to do.  Nobody made
        me promises, threatened [sic] neither have
        used any pressure against me in order to
        obtain my consent for the used [sic] of the
        polygraph.  I understand my consent for the
        used [sic] of the polygraph. . . .
Len-Delfis testified that he understood that the first waiver
applied to questions Agent Lpez would ask him before the actual
polygraph test, and that the second waiver applied to yes-or-no
questions asked during the polygraph test.  He testified that he
never consented to post-test questioning.  Len-Delfis stated that
Agent Lpez told him the test would take two to two and one-half
hours to complete and his attorney could not be present during the
test.  Len-Delfis' attorney decided to return to his office, and
he told Agent Lpez and Agent Narro, who would be observing the
testing, that he was available by telephone.  Additionally, he told
Len-Delfis to call him or return to his office immediately after
the test was administered.
        Len-Delfis testified that Agent Lpez asked only eight
questions, and the test took only 20 to 25 minutes.  Len-Delfis
thought he was free to leave after the test.  However, immediately
after the test, while he was still attached to the polygraph, Agent
Lpez asked him, "How do you think that you did?"  Len-Delfis
responded, "Well, I think I did well because all I did was tell the
truth."  Agent Lpez responded, "Look, you flunked the test, so how
about telling us the truth."  Len-Delfis remembered that Agent
Lpez immediately began to question him, joined by Agent Narro
shortly thereafter.  He felt pressured:  the agents told him the
United States Attorney would "destroy you in Court in front of your
family"; that he was a half-man; and that if he was going to
cooperate, "it has to be between today or tomorrow," and if he
delayed, they might press charges for other crimes.  In an
interview lasting over an hour that followed, Len-Delfis confessed
to his participation in the conspiracy.
        Agent Lpez testified at the suppression hearing that a
typical polygraph test consisted of pre-test questioning to
determine suitability for testing and to build rapport between the
examiner and the examinee; the test itself; and post-test
questioning to present the results of the test and allow the
examinee to explain the results if desired.  However, when Agent
Lpez was asked on cross-examination whether he informed Len-
Delfis and Len-Delfis' attorney that post-test questioning might
occur, he first answered, "I wasn't asked," and then, although not
clear, he seemed to testify that he had not explained the post-test
questioning procedure.  He also acknowledged that post-test
questioning was not mentioned in the waivers Len-Delfis signed.  
When asked why he told Len-Delfis that the test would take two to
two and one-half hours to complete, when in fact the test took less
than one-half hour, he answered "That was my estimate."  He stated
that FBI policy discouraged an attorney's presence during the test,
but he denied prohibiting Len-Delfis's attorney from attending.  
Agent Lpez said that after the test was finished, he merely said,
"Mr. Len, we have a problem.  You are not being . . . completely
honest," and that Len-Delfis then "started providing
explanations."  However, he denied pressuring or threatening Len-
Delfis during the post-test interview.  He also reminded the court
that Len-Delfis was interviewed by FBI Agent Johnson twice before,
in November 1996 during the initial FBI investigation of the case,
and that statements he made during the polygraph test conflicted
with these previous interviews.
        The district court denied the motion to suppress,
stating:
        I believe that Mr. Len was no newcomer to
        being interviewed by F.B.I. agents.  He had
        been interviewed previously on two occasions.  
        Here in front of his attorney he signed two
        waivers; one of them for the polygraph test,
        the other one for any questions that might be
        asked of him even at the time that the pre-
        test interview was held.  He even at that time
        according to the testimony of Agent Lpez, he
        stated that he had given prior information
        which was not correct.  The onus as counsel
        tried to impress upon the Court, the onus is
        not on the F.B.I. agent or the government
        agent taking the -- making the interview to
        stop and say, hey, do you want to call your
        attorney now.  He was aware where his attorney
        was.

          As a matter of fact he had gone the day
        previously without an attorney and the agent
        said no, you come back with your attorney
        because we want your attorney to be present
        and so the perception of the Court is that he
        was aware of what was happening, that any
        statements he made after he was informed, that
        he did not pass, was not a subterfuge used by
        the government to obtain admissions.  
        Therefore, the Court understands that the
        statements he made post the interview, post
        the exam were voluntary and, therefore, the
        motion to suppress is denied.

The confession Len-Delfis gave in the post-test interview was used
against him at trial.  During the jury's deliberation, it requested
to have testimony describing Len-Delfis' confession reread to
them, and shortly thereafter, the jury found Len-Delfis guilty.
        The factual issue of concern is whether Len-Delfis was
advised of and waived his Fifth and Sixth Amendment rights for the
post-test interview in which he made incriminating responses to FBI
questions.  At the suppression hearing, Len-Delfis testified that
Agent Lpez informed him about pre-test questioning but not about
post-test questioning.  Agent Lpez testified that he usually
explains that he will ask post-test questions; however, on cross-
examination, he appears from the record to state that he did not
inform Len-Delfis of this possibility.  In its appellate brief, at
oral argument, and in a post-oral argument letter, the government
pointed out portions of Agent Lpez's testimony that it contends
shows that he advised Len-Delfis about post-test questioning.  
Unfortunately, the district court did not make a specific finding
in this regard, nor did a party ask for such a finding.  However,
the court did make a finding that one of the waivers Len-Delfis
signed applied to pre-test questioning and the other wavier applied
to the polygraph questioning.  This at least suggests that the
court believed Len-Delfis's testimony that he was not informed
about post-test questioning.  The fact that the district court
failed to make any finding on this issue militates against the
government.  "It is a general principle of appellate jurisprudence
that a party desiring more particularized findings at the trial
court level must request them from the trial court."  United States
v. Tosca, 18 F.3d 1352, 1355 (6th Cir. 1994).  Absent a finding on
this issue, the responsibility falls on us to examine the record
and conclude whether the government met its burden of demonstrating
that a proper warning was given.  We have scrutinized the testimony
from the suppression hearing, and found substantial evidence to
support a finding that Agent Lpez did not inform Len-Delfis about
post-test questioning.  That was Len-Delfis' testimony, and
appears to be Agent Lpez's testimony when asked that specific
question on cross-examination.  Certainly this interpretation is
consistent with Agent Lpez's earlier testimony when he was called
upon to testify whether he advised Len-Delfis post-test
questioning might occur:  he merely responded "I wasn't asked."
        Based upon the record and the district court findings, we
assume that Len-Delfis was not advised by Agent Lpez of the
possible post-test interrogation.
                               B.
        The Sixth Amendment to the United States Constitution
states:  "In all criminal proceedings, the accused shall enjoy the
right . . . to have the assistance of counsel for his defense."  
That right "is indispensable to the fair administration of our
adversarial system of criminal justice."  Maine v. Moulton, 474
U.S. 159, 168 (1985).  Accordingly, the Supreme Court has
recognized
        that the assistance of counsel cannot be
        limited to participation in a trial; to
        deprive a person of counsel during the period
        prior to trial may be more damaging than
        denial of counsel during the trial itself.  
        Recognizing that the right to the assistance
        of counsel is shaped by the need for the
        assistance of counsel, we have found that the
        right attaches at earlier, critical stages in
        the criminal justice process where the results
        might well settle the accused's fate and
        reduce the trial itself to a mere formality.

Id. at 170 (internal quotation and citations omitted).
        Pursuant to the Sixth Amendment, "a person is entitled to
the help of a lawyer at or after the time that judicial proceedings
have been initiated against him -- whether by way of formal charge,
preliminary hearing, indictment, information, or arraignment."  
Brewer v. Williams, 430 U.S. 387, 398 (1977) (internal quotation
and citations omitted).  Thus, the government does not, and cannot,
dispute that Len-Delfis' Sixth Amendment right to counsel attached
previous to the questioning at issue, because he was arraigned on
May 7, 1997, prior to the polygraph test and post-test questioning
on June 15, 1998.  See id.; see also Michigan v. Jackson, 475 U.S.
625, 629 (1986) ("The arraignment signals the initiation of
adversary judicial proceedings and thus the attachment of the Sixth
Amendment . . . .") (internal quotation and citation omitted).  
Additionally, the government does not, and cannot, challenge that
Len-Delfis' Sixth Amendment right to counsel applied to the post-
polygraph questioning.  See id. at 630 (stating that after
arraignment, "government efforts to elicit information from the
accused, including interrogation, represent critical stages at
which the Sixth Amendment applies") (internal quotation omitted).  
Thus, the issue is whether Len-Delfis validly waived that right
for purposes of questioning that occurred after the polygraph test.
        The government has the burden to "prove an intentional
relinquishment or abandonment" of the Sixth Amendment right to
counsel.  Brewer, 430 U.S. at 404, quoting Johnson v. Zerbst, 304
U.S. 458, 464 (1938), overruled in part on other grounds by Edwards
v. Arizona, 451 U.S. 477 (1981); see also Jackson, 475 U.S. at 633.  
The Court has stated "that we should 'indulge every reasonable
presumption against waiver of fundamental constitutional rights.'"  
Jackson, 475 U.S. at 633, quoting Johnson, 304 U.S. at 464.  
"Doubts must be resolved in favor of protecting the constitutional
claim."  Jackson, 475 U.S. at 633.  "The determination of whether
there has been an intelligent waiver of the right to counsel must
depend, in each case, upon the particular facts and circumstances
surrounding that case, including the background, experience, and
conduct of the accused."  Johnson, 304 U.S. at 464.
        In Edwards, the Court, considering the Fifth Amendment
right to counsel, held that after an accused person in custody
"expressed his desire to deal with the police only through counsel,
[he] is not subject to further interrogation by the authorities
until counsel has been made available to him, unless the accused
himself initiates further communication, exchanges, or
conversations with the police."  Edwards, 451 U.S. at 484-85.  
Several years later, in Michigan v. Jackson, the Court held that
the rule in Edwards also applied after a defendant invoked his
Sixth Amendment right to counsel:
        We thus hold that, if police initiate
        interrogation after a defendant's assertion,
        at an arraignment or similar proceeding, of
        his [Sixth Amendment] right to counsel, any
        waiver of the defendant's right to counsel for
        that police-initiated interrogation is
        invalid.

          Although the Edwards decision itself rested
        on the Fifth Amendment and concerned a request
        for counsel made during custodial
        interrogation, the [lower court] correctly
        perceived that the reasoning of that case
        applies with even greater force to these
        [Sixth Amendment] cases.

475 U.S. at 636; see also Moulton, 474 U.S. at 170-71 ("Once the
right to counsel has attached and been asserted, the State must of
course honor it. . . .  [A]t the very least, the prosecutor and
police have an affirmative obligation not to act in a manner that
circumvents and thereby dilutes the protection afforded by the
right to counsel.") (footnote omitted).  Jackson makes it clear
that once a defendant's Sixth Amendment right to counsel attaches,
the police cannot initiate questioning in the absence of counsel
without violating that right.
        While looking at the totality of the circumstances,
several courts have articulated relevant facts to be considered in
identifying "the background, experience, and conduct of the
accused," Johnson, 304 U.S. at 464, in determining whether a signed
waiver of one's Fifth or Sixth Amendment right to counsel for
purposes of a polygraph test carries over to post-polygraph
interrogation.  Those circumstances include who requested the
polygraph examination; who initiated the post-polygraph
questioning; whether the signed waiver clearly specifies that it
applies to post-polygraph questioning or only to the polygraph
test; and whether the defendant has consulted with counsel.  See
Wyrick v. Fields, 459 U.S. 42, 47 (1982) (per curiam); United
States v. Johnson, 816 F.2d 918, 921 n.4 (3d Cir. 1987); United
States v. Gillyard, 726 F.2d 1427, 1427-29 (9th Cir. 1984); United
States v. Eagle Elk, 711 F.2d 80, 82 (8th Cir. 1983).
        After careful review, we cannot accept the district
court's holding that Len-Delfis waived his right to counsel for
purposes of the post-polygraph questioning.  The difficulty began
when the district court applied the wrong legal standard.  The
district court stated that "the onus is not on the F.B.I. agent or
the government agent" to avoid questioning.  However, because Len-
Delfis' Sixth Amendment right to counsel had clearly attached, the
government could not initiate questioning in the absence of counsel
without potentially violating that right.  See Jackson, 475 U.S. at
636; Moulton, 474 U.S. at 170-71.  Had Len-Delfis initiated the
post-polygraph discussion, we might reach a different outcome.  But
he did not.  Both he and Agent Lpez testified that the agents
began the post-polygraph dialogue.  The agents were required to
respect Len-Delfis' right to counsel by not questioning him in the
absence of his attorney.
        In addition, the evidence indicates that Len-Delfis did
not waive his right to counsel.  Len-Delfis was neither told that
post-test questioning would occur nor signed a waiver that
specifically mentioned the possibility of post-test questioning.  
Additionally, the FBI agents who questioned Len-Delfis knew that
he was actually represented by counsel; that he did not request the
polygraph test but only consented to it after suggestion by the
Assistant United States Attorney; and that Agent Lpez initiated
the post-polygraph conversation and questioning, not Len-Delfis.
        It is true, as the district court found, that Len-Delfis
was previously questioned by the FBI.  However, the factual
circumstances surrounding that questioning were entirely different
than the post-polygraph questioning:  the previous interrogations
occurred while the FBI was first investigating this case, before
Len-Delfis' Fifth or Sixth Amendment rights to counsel attached.  
Additionally, there is no indication that Len-Delfis was a "career
criminal" or that aside from these two previous, limited
examinations he was intimately acquainted with the criminal justice
system.  In any case, that the FBI previously questioned Len-
Delfis does not alone outweigh other facts pointing to an unknowing
and involuntary waiver for purposes of the post-polygraph
questioning.
        It is also true that Len-Delfis signed two waivers of
rights on the day of the interrogation.  The district court relied
upon these waivers in support of its holding that Len-Delfis
waived his right to counsel for post-polygraph questioning.  
However, the district court found that one waiver applied to pre-
test questioning, and one to polygraph test questioning.  It does
not follow that Len-Delfis waived his right to counsel for post-
test questioning because he waived his right to pre-test and test
questioning:  waivers of rights are specific.  See United States v.
Eaton, 890 F.2d 511, 513 (1st Cir. 1989) (right to counsel); United
States v. Allee, 888 F.2d 208, 214 (1st Cir. 1989) (per curiam)
(right against self-incrimination); United States v. Johnson, 816
F.2d at 922 n.4 (right to counsel).  The waivers Len-Delfis signed
did not specifically mention the possibility of post-polygraph
questioning, and Agent Lpez failed to explain that post-polygraph
questioning would occur.  All these facts suggest exactly the
opposite conclusion than that made by the district court:  that
Len-Delfis' having signed two previous waivers did not mean he
knowingly and intelligently waived his rights for post-polygraph
questioning.
        Looking at the totality of the circumstances and
specifically focusing on the relevant inquiry articulated by courts
referred to above, we hold that the district court erred in
concluding that Len-Delfis intelligently and knowingly waived his
Sixth Amendment right to counsel for the post-test interrogation
and that his confession was not admissible.  Even so, we will not
reverse a conviction because of trial error in admitting evidence
obtained in violation of a defendant's Sixth Amendment right to
counsel unless the error was "harmless beyond a reasonable doubt."  
Milton v. Wainwright, 407 U.S. 371, 372 (1972).  We recently
stated:
          The ordinary test for harmless error is
        sometimes said to turn on whether it is
        "highly probable" that the improperly admitted
        evidence "contributed" to the conviction.  But
        since any relevant evidence wrongly admitted
        probably was considered by the jury (and
        therefore "contributed" in a literal sense), a
        more useful formulation of the harmless error
        question is to ask whether the result would
        have been the same if the disputed evidence
        had not been admitted.  We have therefore said
        that a conviction will be upheld if it is
        "highly probable" that the result would have
        been the same.

United States v. Vigneau, 187 F.3d 82, 86 (1st Cir. 1999)
(citations omitted).  Additionally, "for certain errors that are
constitutional in character, the error must be harmless beyond a
reasonable doubt."  Id. (internal quotation omitted).  In this
case, we cannot say, beyond a reasonable doubt, that it is highly
probable that the jury would still have convicted Len-Delfis in
the absence of the incriminating evidence.  Confessions are by
nature highly probative and likely to be at the center of a jury's
attention.  Here, we have additional indications that the jury
contemplated that evidence:  it requested to hear the description
of the confession again during its deliberations, and then
convicted him.  Therefore, we reverse his conviction and remand for
a new trial at which the confession obtained after the polygraph
test is suppressed.  See Jackson, 475 U.S. at 628-29 (affirming
state court holding that evidence obtained in violation of
defendant's Sixth Amendment right to counsel should have been
suppressed at trial).
                              III.
        Len-Delfis also argues that the district court should
have given the jury a multiple conspiracy defense instruction.  
Because we reverse Len-Delfis' conviction, it is unnecessary to
address this argument as to him.  See United States v. Gray, 63
F.3d 57, 61 n.3 (1st Cir. 1995).  In addition, Santiago-Snchez did
not raise this issue in the district court, but attempted to do so
on appeal by a reference in his brief to Len-Delfis' argument.
        Santiago-Snchez's brief merely states that he "herein
joins in the [multiple conspiracy defense instruction] issue
presented to the Honorable Circuit Court . . . by co-appellee
Hctor Len Delfis."  He does not attempt to explain how this
argument applies to him, and he fails to disclose that he neither
proposed a multiple conspiracy defense instruction in the district
court nor objected when one was not given.  See United States v.
Portela, 167 F.3d 687, 699 (1st Cir. 1999) (reviewing failure to
give jury instruction for plain error when defendant failed to
object at trial); United States v. Crochiere, 129 F.3d 233, 237
(1st Cir. 1997) (reviewing failure to give jury instruction for
plain error when defendant neither proposed jury instruction nor
objected at trial); Senra v. Cunningham, 9 F.3d 168, 171 (1st Cir.
1993) (holding defendant waived objection to jury instruction when
he failed to object at trial).  Len-Delfis objected to the
district court's failure to include a multiple conspiracy
instruction, but we typically require defendants in joint criminal
trials to raise their own objections at trial.  See United States
v. Palow, 777 F.2d 52, 54 (1st Cir. 1985) (defendant waived claim
that trial should have been severed, regardless of fact that other
defendants moved for severance, because he did not individually
move for severance).  This rule is relaxed only when the district
court specifically states that an objection from one defendant will
be considered an objection for all defendants.  See United States
v. Alzanki, 54 F.3d 994, 1005 n.11 (1st Cir. 1995); United States
v. Seplveda, 15 F.3d 1161, 1180 (1st Cir. 1993).  Neither Len-
Delfis nor Santiago-Snchez have informed us that the district
court made such a statement in this case.
        In United States v. Zannino, 895 F.2d 1, 17 (1st Cir.
1990), we refused to consider Zannino's attempt to incorporate
other appellants' arguments by reference because his attempt was
perfunctory and failed to explain how those arguments specifically
applied to him.  That is the case here.  For that reason, and also
because Santiago-Snchez failed to raise this argument in the trial
court, we reject his effort to incorporate by reference, as we did
in the similar case of United States v. Saccoccia, 58 F.3d 754, 790
(1st Cir. 1995).
                              IV.
        Santiago-Snchez also argues that the district court
erred in allowing the government to introduce rebuttal evidence
against him concerning money that was seized from him in a related
civil in rem proceeding and subsequently disallowing him to
introduce surrebuttal evidence on that subject.  These errors,
Santiago-Snchez argues, violated his Sixth Amendment right to
confrontation.  We review the admission of rebuttal and surrebuttal
evidence for abuse of discretion.  See Faigin v. Kelly, 184 F.3d
67, 85 (1st Cir. 1999) (rebuttal evidence); Kines v. Butterworth,
669 F.2d 6, 13 (1st Cir. 1981) (surrebuttal evidence).
        The government introduced in its case in chief a bank
teller's testimony that Santiago-Snchez made two bank deposits in
1996, one of $39,000 and the other of $20,000, which allegedly
related to money laundering charges against him.  During Santiago-
Snchez's defense, his wife testified that their family's finances
in 1996 were such that Santiago-Snchez could have deposited the
$59,000 from personal funds.  On cross-examination, the government
asked her about money that was seized from Santiago-Snchez in a
civil forfeiture in rem proceeding that predated, but stemmed from
the same facts alleged in, the criminal trial.  She said the amount
seized was the family's entire savings, but she was unsure exactly
how much money was seized, although she did not think that it
exceeded $200,000.  When the government questioned her about the
legitimate sources of the amount seized, the sum from sources she
could explain came to $105,500.  As rebuttal evidence, the
government sought to introduce records from the in rem proceeding
indicating that the amount seized was $203,000.  This evidence, the
government argued, served to impeach Santiago-Snchez's wife's
testimony and was circumstantial evidence of Santiago-Snchez's
wrongdoing.  The defense sought an opportunity for surrebuttal to
show that other persons claimed parts of the $203,000 in the in rem
forfeiture proceeding.  The district court admitted the rebuttal
evidence but disallowed surrebuttal.
        We first examine Santiago-Snchez's argument that the
rebuttal evidence should not have been admitted.  He argues that
the evidence was irrelevant pursuant to Federal Rules of Evidence
401 and 402.  However, evidence of possession or control over
substantial sums of money from unexplained sources is relevant in
criminal cases involving money.  See, e.g., United States v. Ford,
22 F.3d 374, 383 (1st Cir. 1994); United States v. Figueroa, 976
F.2d 1446, 1454 (1st Cir. 1992).  Here, the government seized
$203,000, the source of which Santiago-Snchez's wife did not fully
explain.  Thus, the rebuttal evidence was relevant and admissible.
        In the alternative, Santiago-Snchez argues the evidence
was more prejudicial than probative pursuant to Federal Rule of
Evidence 403.  "This is a difficult row to hoe:  'Only rarely --
and in extraordinarily compelling circumstances -- will we, from
the vista of a cold appellate record, reverse a district court's
on-the-spot judgment concerning the relative weighing of probative
value and unfair effect.'"  Saccoccia, 58 F.3d at 773, quoting
Freeman v. Package Mach. Corp., 865 F.2d 1331, 1340 (1st Cir.
1988).  This is not one of those rare circumstances.
        The government's conspiracy and money laundering charges
against Santiago-Snchez alleged that he was in possession of large
sums of illegally secured money.  That he can explain other sources
for that money goes to the weight of that evidence, not
admissibility.  See United States v. Newton, 891 F.2d 944, 949 (1st
Cir. 1989), citing United States v. Tramunti, 513 F.2d 1087, 1105
(2d Cir. 1975).  Evidence of the forfeited money shows that
Santiago-Snchez possessed large amounts of money, the legitimate
source of which was not fully explained.  The district court was
thus within its discretion to allow the rebuttal evidence.
        Santiago-Snchez also argues he should have been given an
opportunity to provide surrebuttal evidence that would have shown
that other individuals claimed part of the seized money.  "A trial
court has great discretion over the permissible scope of testimony
in surrebuttal . . . ."  United States v. Gaines, 170 F.3d 72, 83
(1st Cir. 1999).  Surrebuttal is only allowed "'to explain away new
facts brought forward by the proponent in rebuttal, or evidence to
impeach a witness who testified in rebuttal.'"  Id., quoting F.W.
Woolworth Co. v. Contemporary Arts, Inc., 193 F.2d 162, 166-67 (1st
Cir. 1951).  Ordinarily, surrebuttal is not allowed when it
concerns issues raised prior to the opponent's rebuttal and the
proffered evidence could have been introduced at that time.  See
Gaines, 170 F.3d at 83 (affirming district court's decision to
disallow surrebuttal concerning an "issue . . . raised prior to
. . . rebuttal" when party elected not to introduce evidence);
Kines, 669 F.2d at 13-14 (holding, in collateral review of state
court decision, that there was no error in rejecting surrebuttal
that was cumulative and could have been introduced before state's
rebuttal).
        As indicated, the surrebuttal Santiago-Snchez proffered
dealt with claims other persons had to the money seized in the in
rem proceeding.  The district court was well within its discretion
in not allowing it.  First, it concerned a subject that was at
issue before the government introduced its rebuttal evidence:  the
legitimate source of the money seized in the in rem proceeding.  
After the government's cross-examination of Santiago-Snchez's
wife, in which she was questioned about the source of the money
seized, the defense could have introduced evidence about any other
claims to that money; however, it chose not to.  See Gaines, 170
F.3d at 83 (disallowing surrebuttal on issue raised prior to
rebuttal when party elected not to introduce evidence).  Second,
the surrebuttal was not proffered to impeach a rebuttal witness or
explain away new facts raised during rebuttal.  Santiago-Snchez
did not try to introduce evidence suggesting the amount seized was
less than $203,000; thus, it was not offered for impeachment
purposes.  He also could not have explained away new facts raised
in rebuttal, because Santiago-Snchez's wife had already testified
as to other persons' claims to the money in her direct examination.  
Further evidence on that subject would have been repetitive.  For
these reasons, the district court did not abuse its discretion in
disallowing Santiago-Snchez's proffered surrebuttal.
        Santiago-Snchez also argues, as he did before the
district court, that the surrebuttal should have been allowed
pursuant to "the rule of completeness which underlies" Federal Rule
of Evidence 106.  That rule states:  "When a writing or recorded
statement or part thereof is introduced by a party, an adverse
party may require the introduction at that time of any other part
or any other writing or recorded statement which ought in fairness
to be considered contemporaneously with it."  Whether Rule 106
provides an independent ground for admitting evidence at trial is
an open question in this circuit.  See United States v. Boylan, 898
F.2d 230, 257 n.16 (1st Cir. 1990).  In order for us to accept
Santiago-Snchez's Rule 106 argument, we would have to answer this
open question.  However, Santiago-Snchez has not fully briefed
this issue or given us any reason to hold that Rule 106 furnishes
an independent ground to admit evidence in this case.  We leave the
resolution of that question to another day after it has been
properly raised and fully briefed.
                               V.
        Santiago-Snchez also argues that the district court
erred in sentencing him to pay restitution because the government
already seized a larger amount of money from him in the civil
forfeiture in rem action.  He argues that restitution in this
criminal action, in addition to forfeiture in rem in a civil
action, raises potential double jeopardy problems and is unfair.  
We review restitution sentencing orders for abuse of discretion;
related findings of fact are upheld unless clearly erroneous, and
legal questions involved in the order are reviewed de novo.  See
United States v. Vaknin, 112 F.3d 579, 586 (1st Cir. 1997).
        There is no potential double jeopardy problem in this
case.  The Supreme Court has consistently concluded that the Double
Jeopardy Clause "does not apply to [civil forfeitures] because they
do not impose punishment."  United States v. Ursery, 518 U.S. 267,
274 (1996).  As we recently stated:  "A completed civil forfeiture
of property does not constitute 'jeopardy' under the Double
Jeopardy Clause, and does not bar the subsequent criminal
prosecution and punishment of the defendant whose property was
forfeited."  United States v. Candelaria-Silva, 166 F.3d 19, 43
(1st Cir. 1999); see also United States v. One Parcel of Real
Property with Bldgs., Appurtenances, and Improvements, Known as 154
Manley Road, Located in Burrillville, R.I., 91 F.3d 1 (1st Cir.
1996) (per curiam) (following Ursery).
        Santiago-Snchez also argues that restitution in this
case is unfair (1) because he "lacks any degree of control over the
assets from which the restitution is to proceed" inasmuch as the
government, in the civil in rem case, seized the embezzled money;
and (2) the civil in rem case began first and has been stayed only
to protect his constitutional rights in the criminal case.  
Significantly, Santiago-Snchez does not contest that federal
statutes authorize restitution in this case; he merely argues that
restitution is unfair.  However, the language of the sentencing
guidelines and related statutes regarding restitution is plain and
allows the district court no discretion.  The applicable sentencing
guideline clearly states:  "The court shall . . . enter a
restitution order if such order is authorized under 18 U.S.C.
3663-3664 . . . ."  U.S.S.G.  5E1.1(a)(1) (emphasis added).  
Section 3664 likewise states that "the court shall order
restitution to each victim in the full amount of each victim's
losses as determined by the court and without consideration of the
economic circumstances of the defendant."  18 U.S.C.
3664(f)(1)(A) (emphasis added).  These provisions show that the
Sentencing Commission and Congress were more concerned about the
inherent fairness of making crime victims whole than fairness to
defendants who were found guilty of financial crimes.  Cf. United
States v. Porter, 90 F.3d 64, 70 (2d Cir. 1996) ("Congress has
decided to protect the interests of victims of crime.").
        Of course, restitution may not be ordered if "full
restitution has been made" or if "the complication and prolongation
of the sentencing process resulting from the fashioning of a
restitution requirement outweighs the need to provide restitution
to any victims through the criminal process."  U.S.S.G.  5E1.1(b).  
To the extent Santiago-Snchez implies that the first of these
situations applies because the government has seized money in the
civil in rem proceeding, he is incorrect.  Seizure of money in a
civil in rem proceeding does not constitute restitution.  Full
restitution has not been made in the civil case because that case
has not been completed, a final judgment issued, and the money
restored to the proper owner.  In other words, even though money
that might belong to the government has been seized from Santiago-
Snchez, the final adjudication of whether that money in fact
belongs to the government or to Santiago-Snchez has not been made,
and money properly belonging to the government has not been
released to it.  Thus, Santiago-Snchez has not yet made the
government whole.  Thus, the district court did not abuse its
discretion in ordering restitution.
        AFFIRMED as to Santiago-Snchez; REVERSED AND REMANDED as
to Len-Delfis.

</body>

</html>